**SIERRA CLUB, et al., Plaintiffs,**

v.

**Mike ESPY,[1] In His Official Capacity
as Secretary of Agriculture, et
al., Defendants.**

Civ. A. No. L–85–69–CA.

United States District Court,
E.D. Texas,
Lufkin Division.

May 12, 1993.

1. Mike Espy, in his official capacity as Secretary of Agriculture, has been substituted as a defendant (pursuant to Fed.R.Civ.P. 25(d)) for Edward Madigan. Also (pursuant to the same rule), Alan G. Newman, in his official capacity as Forest Supervisor of the National Forests in Texas, United States Forest Service, has been substituted as a defendant for William M. Lannan.

**358**

Douglas Honnold, Denver, CO, Edward Fritz, Dallas, TX, Barbara Lowe, Houston, TX, Larry Daves, San Antonio, TX, for plaintiffs.

Daniel Bowen, Temple, TX, Ruth Harris Yeager, Tyler, TX, Wells D. Burgess, Jean Mellor, Katheryn Toffenetti, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT M. PARKER, Chief Judge.

Before the Court are: the Fourth Amended Complaint of Plaintiff Texas Committee on Natural Resources (TCONR), which has been interpreted by the Court as containing what amounts to a series of motions—for a preliminary injunction, a declaratory judgment, and a permanent injunction prohibiting a number of imminent timber sales by Defen-

dants in the Texas National Forests, as well as all future sales authorizing even-aged timber management;[2] Federal Defendants' Motion for Summary Judgment on TCONR's Even–Aged Claims—in response to the above motions; the Report and Recommendation of the Honorable Judith K. Guthrie, United States Magistrate Judge for the Eastern District of Texas, on the controversy presented by the above motions; Plaintiffs' Objections to Magistrate's Proposed Findings and Recommendations on Even–Aged Claim, along with Plaintiffs' Urgent Motion for Injunction Under 5 U.S.C. § 705; Federal Defendants' Response to Plaintiffs' Objections to Report and Recommendation of the United States Magistrate Judge as Modified for Clerical Error. Also before the Court are: Defendants' Request for Clarification of Order;[3] and Plaintiffs' Response to Request for Clarification.

The Court has read and reread the thorough work of the Magistrate Judge. Yet, for the following reasons, the Plaintiffs' motion for preliminary injunction must be granted as to Defendants' *even-aged management* agenda—pending final resolution of the plaintiffs' claims for declaratory relief and permanent injunction under the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA).[4]

## I. Background

The current controversy over timber sales dates back to the May 20, 1987, Record of

---

**2.** The Texas National Forests include: the Sam Houston National Forest; the Angelina National Forest; the Davy Crockett National Forest; and the Sabine National Forest.

**3.** The *Order* referenced is that entered by the Court on February 9, 1993, which allowed the defendants to proceed with the advertising, sale and implementation of timber contracts on the East Texas National Forests relative to (and only relative to) sales scheduled in Compartment 57 and Compartment 98.

**4.** Plaintiffs' claims against the defendants' scheduled timber sales arise under: the NFMA, 16 U.S.C. §§ 1600–1614, and its implementing regulations, 36 C.F.R. Part 219; the NEPA, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, 40 C.F.R. Parts 1500–1508; and the Administra-

tive Procedure Act (APA), 5 U.S.C. §§ 551–596, §§ 601–612, and §§ 701–706.

The term "even-aged" management includes: "clear-cutting," where all the trees are cut down; "seed-tree cutting," where most of the trees are cut down (*i.e.*, excepting some trees left to naturally seed an area otherwise cut); and "shelterwood cutting," where about double the number of trees are left standing as would be left after a seed-tree cutting expedition. The density of a "shelterwood forest" is fairly low—with only about 16 trees per acre. And even under seed-tree cutting expeditions, the older trees used initially for natural germination purposes will later be removed. *Sierra Club v. Lyng,* 694 F.Supp. 1260, 1263 n. 2 (E.D.Tex.1988), *aff'd in part, vacated in part, and remanded by Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991). "Uneven-aged management," or "selection management,"

Decision by the Regional Forester promulgating the Final Land and Resource Management Plan, National Forests and Grasslands—Texas, and its accompanying Final Environmental Impact Statement. Regarding the NFMA in particular, Plaintiffs contend that the defendants' even-aged logging agenda is illegal in that the agency has not complied with the constraints on the Service's choice of even-aged management techniques contained in that Act. And regarding the NEPA, Plaintiffs argue that the defendants' even-aged logging agenda is illegal in that determinations in favor of even-aged management were made without sufficient examination of various procedural requirements of the NEPA.

In an earlier proceeding, the Court refused to waive the (administrative) exhaustion requirement relative to Plaintiffs' NEPA and NFMA claims. *Sierra Club v. Lyng*, 694 F.Supp. 1256 (E.D.Tex.1988). At that time, it was uncontested that the appeal by TCONR of the LRMP–FEIS was pending before the Forest Service. Plaintiffs argued that the Court should waive the exhaustion requirement because of the irreparable harm that would occur between then and the time

the administrative appeal was decided; and the plaintiffs said that the Forest Service might delay the resolution of the administrative appeal to prolong its current tree cutting practices. At the Court's 1988 hearing, Wells D. Burgess, Esq., counsel for the defendants, assured the Court "that the appeal would most likely be decided in eight months from the hearing date (by September 15, 1988), but no longer than fifteen months from the hearing date (by April 15, 1989)." *Lyng, id.*, 694 F.Supp. at 1258. The Court concluded that the anticipated delay was not so unreasonable as to warrant the Court's intervention at that point in the administrative proceedings. *Lyng, id.*

However, in 1989, the Chief of the Forest Service announced that there would be *no* administrative decision on Plaintiffs' LRMP–FEIS appeal because a new LRMP and FEIS were required in view of the constraints imposed by this Court's Endangered Species Act decision in *Sierra Club v. Lyng*, 694 F.Supp. 1260 (E.D.Tex.1988); *aff'd in part, vacated in part, and remanded by Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991).[5]

in contrast, consists of selecting individual, particular trees in a given area for cutting.

5. On April 11, 1989, the Chief of the United States Forest Service notified Plaintiffs that no decision on the merits of their administrative appeal would be forthcoming, after all. The Chief stated that the Forest Plan was being remanded for revision in light of this Court's ruling regarding protection of the Red–Cockaded Woodpecker and constraints on the 200,000 acres to be managed for the endangered bird. The Regional Forester was directed to conduct a new analysis and to change the Texas Forest Plan, completing the ten planning steps required by 36 C.F.R. § 219.12. Defendants *expect* a final Texas LRMP and EIS to be completed by December, 1993. Federal Defendants' Motion for Summary Judgment on TCONR's Even–Aged Claims, p. 5. Interim management during the time the Forest Plan is being reanalyzed per the Chief's April 11, 1989, Decision is to be governed as follows:

Except as provided below regarding appropriate silvicultural systems, management of the remaining two-thirds of the National Forests will be conducted in accordance with the management prescriptions and standards and guidelines contained in the Forest Plan approved by the Regional Forester on May 20, 1987.

The determination of appropriate silvicultural systems to be used in timber harvesting, including uneven-aged management, is to be

accomplished during project-level analysis. Harvesting under the even-aged management system may be done if it is determined to be appropriate to meet the objectives and requirements of the Forest Plan (Forest Service Handbook 1909.12, Chapter 5 [July 1988]). Clearcutting may be selected as the appropriate harvest method if it is determined to be the optimum method. These determinations must be documented as part of the project decisions. Chief's Decision, at 5. In short, the interim remand Decision provides direction to the Texas Forester to *consider* uneven-aged management systems during project analysis. *Id.* at 6.

This Court's review of the logging agenda at issue is guided in particular by Public Law 101–121, Title III, § 312, of October 23, 1989, at 103 Stat. 743, which states:

The Forest Service and Bureau of Land Management are to continue to complete as expeditiously as possible development of their respective Forest Land and Resource Management Plans to meet all applicable statutory requirements. Notwithstanding the date in section 6(c) of the NFMA (16 U.S.C. 1600 [subsec. (c) of this section]), the Forest Service, and the Bureau of Land Management under separate authority, may continue the management of lands within their jurisdiction under existing land and resource management plans pending the completion of new plans. Nothing shall limit judicial review of particular activities on

The NFMA and NEPA-oriented. timber sale controversy has since been referred to the Honorable Judith K. Guthrie, United States Magistrate Judge, for a report and recommendation. The Report and Recommendation of the United States Magistrate Judge concludes that Plaintiffs are not entitled to certain sorts of judicial review of their claims against the defendants' logging agenda because Plaintiffs have not exhausted their administrative remedies (despite the fact that there is no way for them to do so). *See* Report and Recommendation of the United States Magistrate Judge, pp. 3–4. According to the Magistrate Judge's Report and Recommendation: "[t]hrough no fault of their own, Plaintiffs have been unable to exhaust administrative remedies so that they can directly attack the 1987 LRMP–FEIS on judicial review." Further, the Report and Recommendation of the United States Magistrate Judge concludes that Plaintiffs are foreclosed from judicially attacking the Environmental Assessments (EAs) used to justify the proposed sales as invalid because *based on* an allegedly invalid 1987 LRMP–FEIS:

> these lands: *Provided, however,* That there shall be no challenges to any existing plan on the sole basis that the plan in its entirety is outdated, or in the case of the Bureau of Land Management, solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan: *Provided further, That any and all particular activities to be carried out under existing plans may nevertheless be challenged.*
>
> (emphasis added), *reprinted in* 16 U.S.C.A. § 1604 note (Supp.1993).

6. The timber sale decisions at issue are "tiered" to the 1987 Land Resource Management Plan—Final Environmental Impact Statement (LRMP–FEIS). "Tiering" is the process by which the Forest Service incorporates the broad, programmatic 1987 environmental impact statement and forest management plan for the Texas National Forest by reference, into subsequent and narrower, site-specific documents such as environmental assessments (EAs). 40 C.F.R. § 1508.28, *cited in* Report and Recommendation of the United States Magistrate Judge, p. 3, n. 2.

An EA is a rough-cut, low budget environmental impact statement designed to show whether a full-fledged environmental impact statement is necessary. *Sabine River Authority v. United States Department of the Interior,* 951 F.2d 669, 677 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992). As the Magistrate Judge's Report and Recommendation rec-

"The validity of the 'goal' was established in the LRMP–FEIS and may not be litigated here. Rather, the question for this Court is whether an EA contains facts showing that the proposed harvest is a *rational means of achieving that goal." Id.* at p. 4 (emphasis added).[6]

Subsequent to receipt of the Report and Recommendation of the United States Magistrate Judge and the parties' responses thereto, the Court allowed the defendants to proceed with a limited number of *seed-tree* cuts in the nine scheduled timber sales. *Order* of February 9, 1993. The outstanding question, resolved in this *Memorandum Opinion and Order,* is whether the Court should enjoin the defendants from continuing with their even-aged logging agenda.

## II.  Standard of Review

■■■ The Court must waive the administrative exhaustion requirement in this case because of the excessive "delay" in (or, rather, the absolute *shut-down* of) Defendants' administrative appeal apparatus. Under

ognizes, EAs are prepared in two circumstances. First, when there is no existing environmental impact statement, an EA is required to determine whether a proposed federal agency action will have a significant impact on the environment. If the action will have a significant effect, an EIS must be prepared. Second, when there is a programmatic EIS in place, an EA is required to determine whether the action is one anticipated in the EIS, consistent with the EIS, and sufficiently explored by the EIS. The EA will come to one of two findings: either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact (a FONSI) necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS. *Sabine River Authority, id.* (citing cases).

Defendants claim now, in response to the plaintiffs' objections to the Magistrate Judge's Report and Recommendation, that they did not argue for the essentially categorical, non-exhaustion/foreclosure-of-legal-avenues result reached by the Magistrate Judge. *See generally* Federal Defendants' Response to Plaintiffs' Objections to Report and Recommendation of the U.S. Magistrate Judge; *see also* Transcript of March 3, 1993, Motion Hearing Before the Honorable Robert M. Parker, Chief Judge for the Eastern District of Texas, p. 4 (statement of Wells D. Burgess, Esq.). The fact remains that this is the conclusion Magistrate Judge Guthrie reached through her review and analysis.

both their general equitable powers and powers granted under the APA, courts are to insure that statutory rights are not denied by agency action or inaction. While it is generally accepted that federal agencies are entitled to a presumption of good faith and regularity in arriving at their decisions, *Sierra Club v. Costle,* 657 F.2d 298, 334 (D.C.Cir. 1981), the presumption is not irrebuttable. Federal courts would be abdicating their Constitutional role were they to simply "rubber stamp" agency decisions in the face of complex issues, rather than insuring that such decisions accord with clear congressional mandates. As Judge J. Skelly Wright so aptly put it: "[T]he judicial role ... is to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1111 (D.C.Cir. 1971).

■ The APA requires that the agency undertake a "thorough, probing, in-depth review" of its actions in light of, or relative to controlling, substantive, statutory requirements. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (Marshall, J.). This APA-delineated standard of review insures that the agency's ultimate actions actually accord with the substantive "outer boundaries" or limitations marked by the NFMA, for example. *See e.g., Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201, 210 (5th Cir.) ("The NFMA is a set of outer boundaries within which the Forest Service *must* work. *Within its parameters,* the management decision belongs to the agency and should not be second-guessed by a court.") (emphasis added), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978).

■ The APA, at 5 U.S.C. § 706, provides in relevant part that "the reviewing court shall decide all relevant questions of law, interpret Constitutional and statutory provisions, and determine the meaning or applica-

bility of the terms of an agency action." In particular, the reviewing court is to hold unlawful and set aside agency action, findings, and conclusions when they are found to be: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; **or** in excess of statutory jurisdiction, authority, **or limitations,** or short of statutory right. 5 U.S.C. § 706(2)(A) & (C).

■ Moreover, the United States Supreme Court has ruled that *ambiguous* statutes are to be deemed provisions of *policy* discretion (*i.e.,* for the agency), rather than of *purely legal interpretation* (*i.e.,* for the courts)—and are thus properly "deferred" by courts to agencies for (reasonable) policymaking. *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Stevens, J.). *Accord Presley v. Etowah County Commission,* —— U.S. ——, ——, 112 S.Ct. 820, 831, 117 L.Ed.2d 51 (1992) (Kennedy, J.); *United States v. Alaska,* —— U.S. ——, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) (White, J.). *Chevron* thus dictates that it is the *clarity* of the substantive statutory law, not merely the existence of it, which separates law and policy and accordingly dictates the appropriate degree of judicial review under the APA. *See Chevron, supra,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent" by "employing traditional tools of statutory construction") (citations omitted); *id.* at 865–866, 104 S.Ct. at 2792–2793 (but, in the absence of clear statutory directives, courts must "respect legitimate policy choices" of government actors who are reviewable by a political constituency). *See also Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803) (Marshall, C.J.) (asserting that the courts' reviewing power is triggered "where a specific duty is assigned by law...."; and that discretionary acts by the executive "are only politically examinable").[7]

---

7. Some, though, contend that by requiring deference to agency legal interpretations in certain instances, *Chevron* is, categorically, *in tension*

with *Marbury. See generally e.g.,* Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State,* 89 COLUM L.REV.

Thus, the applicable standard of review for *ambiguous* statutory directives, as well as for largely discretionary procedural statutory decisions under the NFMA and the NEPA, is whether the challenged action is reasonable (*i.e.,* relative to goals, or ends, themselves within the substantive "outer boundaries" of the NFMA). *Chevron, supra,* 467 U.S. at 865, 104 S.Ct. at 2792 ("an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments."); *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 59, 103 S.Ct. 2856, 2875, 77 L.Ed.2d 443 (1984) (Rehnquist, J., concurring in part and dissenting in part) ("As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration."); *Citizens for Environmental Quality v. United States,* 731 F.Supp. 970, 983 (D.Colo.1989) (holding that, in reviewing the Forest Service's procedural decisions, a court should consider whether such are reasonable) (citing *Portela v. Pierce,* 650 F.2d 210, 213 (9th Cir.1981)).

### III. Preliminary Injunction Analysis

Injunctive relief is the most common form of remedy sought by citizens suing federal agencies in environmental cases. In such cases, courts have traditionally exercised considerable equitable discretion in deciding whether to issue injunctions. *See e.g., Citizens for Environmental Quality v. United States,* 731 F.Supp. 970, 996–997 (D.Colo. 1989) ("The issuance of an injunction is governed by traditional principles of equity. [ ] The granting or refusing of injunctive relief rests in the sound discretion of the court.") (citing: *Stringer v. United States,* 471 F.2d 381, 384 (5th Cir.), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973); and *Goldammer v. Fay,* 326 F.2d 268 (10th Cir. 1964), for respective propositions).

In purely private-party civil suits, courts have long balanced the claims and potential injuries (harms) to each party before deciding whether to enjoin challenged conduct. Such balancing of claims and harms remains appropriate in citizen suits against *federal agencies* on allegations of the agencies' non-compliance with unambiguous statutory prescriptions. But in this latter area, traditional injunctive relief analysis also gives rise to separation of powers and checks and balances considerations. *See generally* Michael D. Axline, *Constitutional Implications of Injunctive Relief Against Federal Agencies in Environmental Cases,* 12 HARV. ENVTL.L.REV. 1, 1 (1988).[8]

Under the traditional framework of preliminary injunction analysis, Plaintiffs must establish four factors in order to obtain relief:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable harm absent an injunction;

(3) that the irreparable harm threatened is greater than that caused by the injunction; and

---

452 (1989); Keith Werhan, *The Neoclassical Revival in Administrative Law,* 44 ADMIN.L.REV. 567 (1992).

8. Of course, despite the formally tripartite nature of our Constitutional scheme of government, often referred to as a scheme of separation of powers, there is considerable overlap in functions among the formal governmental branches. These overlaps give rise to a system of "checks and balances" that is supposed to prevent any one branch from exceeding the proper limits of its power or from exercising its power improperly. *See Mistretta v. United States,* 488 U.S. 361, 380–384, 109 S.Ct. 647, 658–660, 102 L.Ed.2d 714 (1989); JAMES MADISON, THE FEDERALIST No. 48 and THE FEDERALIST No. 51; CHARLES LOUIS DE

SECONDAT MONTESQUIEU, THE SPIRIT OF LAWS. A COMPENDIUM TO THE FIRST ENGLISH EDITION xiii, at 72 (D. Carrithers ed. 1977) (first edition published in 1748) ("Evident throughout Montesquieu's political writings is a profound distrust of unchecked political power."). *See also* Clark Byse, *Judicial Review of Administrative Interpretation of Statutes: An Analysis of* Chevron's *Step Two,* 2 ADMIN.L.J. 255, 262 (1988) (finding "merits to both the pro and con arguments relating to *Chevron* " and counseling "a middle ground which will enable agencies to function effectively and, at the same time, avoid shackling reviewing courts with a single, simple indiscriminate mode of review that would materially hinder them in the performance of their essential control function.").

(4) that the public interest would be served by the injunction.

*See generally Sierra Club v. Lyng,* 694 F.Supp. 1260, 1277 (E.D.Tex.1988). If irreparable injury to the environment is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1986) (White, J.).

### A. Plaintiffs Enjoy a Substantial Likelihood of Success on Their NFMA and NEPA Claims

The Court is convinced that Plaintiffs are substantially likely to succeed on their NFMA and NEPA claims against Defendants' even-aged logging agenda.

#### 1. The NFMA Sets Unambiguous, Substantive Boundaries on Agency Discretion

■ It appears quite likely that Plaintiffs will succeed in demonstrating that Defendants have failed to fulfill the latter's substantive NFMA obligations. Defendants have taken the extreme, and untenable, position that there is no provision of the APA or the NFMA allowing the plaintiffs to judicially challenge actual, on-the-ground practices of the Forest Service. Transcript of March 3, 1993, Motion Hearing Before the Honorable Robert M. Parker, Chief Judge for the Eastern District of Texas, p. 14 (statement of Wells D. Burgess, Esq.) (hereinafter Hearing Transcript). Defendants have argued to the Court that the NFMA is a mere "planning statute," *i.e.,* with *no* substantive component (in contrast, they say, to the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.,* for example). Hearing Transcript, p. 16

(statement of Wells Burgess, Esq.).[9] However, the NFMA does erect unambiguous, substantive "outer boundaries" on the Forest Service's discretion in terms of forest management valuations (*i.e.,* the setting of agency goals, or "ends") and concomitant, consistent practices.

The NFMA addresses *wildlife* management, for example, on several levels. Some of the Act's provisions are general, and others are far more specific. *Id.* at 291. This Court is presently most concerned with the quite specific NFMA requirement that even-aged cuts such as those scheduled by Defendants "are carried out in a manner *consistent with* the *protection of* soil, watershed, fish, wildlife, recreation, and aesthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F)(v) (emphasis added). The mandate of this Section is amplified by the NFMA's Section 1604(g)(3)(B), which states that the Service Planners must manage to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives."[10]

### Defendants Seem to Have "Managed" to Turn Congress' NFMA–Envisioned *Exception* Into Their Rule

■ Specifically, the NFMA mandates that the Service "insure," by *means* of regulation promulgation, this essential *end:* that even-aged management practices be used in the national forests *only when* "consistent with the *protection of* soil, watershed, fish, wildlife, recreation, and aesthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F)(v) (emphasis added). The NFMA thus contemplates that even-aged management techniques will be

---

**9.** Defendants follow through by stating that the remedies available to Plaintiffs are simply administrative. And yet, as already noted: after having secured this Court's deference back in 1988 to an administrative review "assured" to be decided "no longer than fifteen months from the hearing date (by April 15, 1989)," the defendants *shut down* the administrative apparatus they herald. Also, it is certainly not insignificant that the Forest Service's developed practice "of issuing a decision, upholding it on administrative appeal, and then withdrawing it after the plaintiff has filed a lawsuit" has been judicially recognized— recently and nearby. *See e.g., Sierra Club v.*

*Robertson,* 764 F.Supp. 546, 554–555 (W.D.Ark. 1991). *See also Seattle Audubon Society v. Moseley,* 798 F.Supp. 1494, 1497 (W.D.Wash.1992) ("The record in this case and in *SAS v. Evans,* 952 F.2d 297 (9th Cir.1991), shows a long history of delays by the Forest Service.").

**10.** The remainder of this subsection provides specifically that steps must be taken, to the degree practicable, to preserve "the diversity of tree species similar to that existing in the region controlled by the plan."

used only in exceptional circumstances. Yet, the defendants appear to utilize even-aged management logging as if it comprised the statutory "rule," rather than the exception. The Service in fact utilizes *uneven-aged* management techniques very rarely—*i.e.*, as an exception to *even-aged* logging. In the ESA-oriented *Lyng* decision, it was noted that the 1987 Plan provided for one hundred percent (100%) of the timber base of the East Texas National Forests, or eighty-two (82%) of the entire forest was under even-aged management.[11] And still today, with respect to the nine scheduled sales at issue: of the 6,027 acres scheduled to be cut, only 587 acres, or less than ten percent (< 10%) of the total acres scheduled, would be cut by *selection (uneven-aged) management* methods.

The mandate of Section 1604(g)(3)(F)(v) could not be more clearly expressed: actions speak louder than words. No amount of *means*—or *words of "consideration"*—can take the place of the statutorily-compelled *end*—or *action*—that the Service must perform. The NFMA clearly requires the Service's Planners to treat the natural resources of our national forests as controlling, co-equal factors in forest management—in particular, as substantive limitations on the particular logging practices that can take place in these forests. *That* is why the Act's Section 1604(g)(3)(F)(v) states that the Service can use even-aged logging practices only in the

exceptional circumstance—*i.e.*, only when such is insured to be consistent with the protection of the forests' natural resources. And this statutory duty clearly requires protection of the *entire biological community*—not of one species (*e.g.*, the Red–Cockaded Woodpecker) alone. Indeed, the imposition by this provision of such a broad and stringent duty to protect reflects the truism that the monoculture created by clear-cutting and resultant even-aged management techniques is contrary to NFMA-mandated bio-diversity. *See* 16 U.S.C. § 1604(g)(3)(B).

History illuminates the NFMA's clear substantive mandate.[12] During the sixteen (16) years following enactment of the Multiple–Use Sustained Yield Act of 1960 (MUSY), Congress imposed only *one* major substantive restriction on the Forest Service's discretion in wildlife matters, and that was the one reflected in the Endangered Species Act of 1973 (ESA), at 16 U.S.C. § 1536(a)(2).[13] While the ESA set out mandatory constraints on all land use decisions that might adversely affect the habitat of a *threatened or endangered species*, it extended protection only to those species specifically listed as threatened or endangered by the Secretary of the Interior. As to all other forest species, the Service possessed virtually absolute, unreviewable managerial discretion.

Public outcry over the use, or abuse, of that discretion, if not the broad agency dis-

11. *Sierra Club v. Lyng*, 694 F.Supp. 1260, 1263 n. 2 (E.D.Tex.1988) (citing: Final Environmental Impact Statement, Land and Resource Management Plan—National Forests and Grasslands—Texas (1987) (Forest Plan EIS), pp. III–14 to III–16; and Final Land and Resource Management Plan—National Forests and Grasslands—Texas (1987) (Forest Plan), pp. J–2, J–3).

12.     As for the propriety of using legislative history at all, common sense suggests that inquiry benefits from reviewing additional information rather than ignoring it. As Chief Justice Marshall put it, "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived."[ ] Legislative history materials are not generally so misleading that jurists should never employ them in a good faith effort to discern legislative intent. *Our precedents* demonstrate that the Court's practice of utilizing legislative history reaches well into its past.[ ] We suspect that the practice will likewise reach well into the future.

*Wisconsin Public Intervenor v. Mortier*, —— U.S. ——, —— n. 4, 111 S.Ct. 2476, 2484 n. 4, 115 L.Ed.2d 532 (1991) (White, J.) (quoting *Fisher v. Blight*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805), and citing *Wallace v. Parker*, 31 U.S. (6 Peters) 680, 687–690, 8 L.Ed. 543 (1832), respectively).

13.   While the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. §§ 4321–4347), and the Sikes Act Extension (SAE) of 1974 (16 U.S.C. §§ 670g–670o) were enacted during this time, neither imposed substantive restrictions upon the Service. There is some substantive component to the Wild Free–Roaming Horses and Burros Act of 1971, 16 U.S.C. §§ 1331–1340. Yet, while this Act applies to the Forest Service, the animals covered by it are mostly on Bureau of Land Management (BLM) lands, not in the national forests. Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests*, 64 Or.L.Rev. 1, 290 n. 1547 (1985).

cretion itself, led Congress to intervene in the Service's operations—first by way of oversight, and later, in 1976, through enactment of the NFMA. *See generally* Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests,* 64 OR.L.REV. 1, 290–291 (1985) (hereinafter Wilkinson & Anderson, *Land and Resource Planning* ).[14] The public and Congress were concerned that, left to its own essentially unbridled devices, the Service would manage the national forests as mere monocultural "tree farms."[15]

When Senator Hubert H. Humphrey introduced legislation calling for the national forests to be managed on a better balanced, ecologically sound basis, he said:

> The days have ended when the forest may be viewed only as trees and trees viewed only as timber. The soil and water, the grasses and the shrubs, the fish and the wildlife, and the beauty that is the forest must become integral parts of resource managers' thinking and actions.

FOREST AND RANGELAND MANAGEMENT: JOINT HEARINGS BEFORE THE SUBCOMM. ON ENVIRONMENT, SOIL CONSERVATION, AND FORESTRY OF THE SENATE COMM. ON AGRICULTURE AND FORESTRY AND THE SUBCOMM. ON THE ENVIRONMENT AND LAND RESOURCES OF THE SENATE COMM. ON INTERIOR AND INSULAR AFFAIRS, 94th Cong., 2d Sess., at p. 260 (Comm. Print 1976) (statement of Senator Humphrey), *quoted in* Wilkinson & Anderson, *Land and Resource Planning, supra,* at 292. The actual discretion for which the defendants argue amounts to nothing less than a bald attempt at exorbitant agency self-aggrandizement— *i.e.,* an effort to return to "the bad old days" decried by Senator Humphrey, among others, which were supposed to be left behind by the NFMA.[16]

The Court cannot "rubber stamp" the clearly overly-restrictive interpretation of the NFMA the defendants advocate; "[t]his argument does not meet the express requirement of the statute." *Presley v. Etowah County Commission,* — U.S. —, — —, 112 S.Ct. 820, 831–832 (1992) (Kennedy, J.). In this case, like in *Presley* (a Section 5, Voting Rights Act (42 U.S.C. § 1973c) case):

> The United States urges that despite our understanding of the language of § 5,

---

**14.** There has been increasing recognition of, and principled discomfort with modern-era agency power. *See generally* Theodore J. Lowi, *Two Roads to Serfdom: Liberalism, Conservatism and Administrative Power,* 36 AM.U.L.REV. 295, 295–296 (1987) ("the delegation of broad and undefined discretionary power from the legislature to the executive branch deranges virtually all constitutional relationships and prevents attainment of the constitutional goals of limitation of power, substantive calculability, and procedural calculability."); LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 320 (1965) ("The availability of judicial review is the necessary condition, psychologically if not logically, of a system of administrative power which purports to be legitimate, or legally valid."); JAMES O. FREEDMAN, CRISIS AND LEGITIMACY. THE ADMINISTRATIVE PROCESS AND AMERICAN GOVERNMENT (1978) (cataloging recognitions by observers of regulatory law that congressional purposes could be undermined not merely by excessive regulation, but also by insufficient regulation or agency hostility to statutory programs); MANCUR OLSON, THE LOGIC OF COLLECTIVE ACTION: PUBLIC GOOD AND THE THEORY OF GROUPS (1971) (empirical work suggesting that agencies are sometimes subject to sustained political pressure from regulated industries; the result being termed agency "capture"); PAUL J. QUIRK, INDUSTRY INFLUENCE IN FEDERAL REGULATORY AGENCIES (1981) (general discussion of the agency "capture" phenomenon).

**15.** *See generally* Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests, id.* at 171–173.

**16.** Senator Jennings Randolph was another disturbed by the substantial loss of wildlife habitat resulting from the Service's pre-NFMA, even-aged logging-oriented management of the national forests. He introduced his own bill, concurrent with Senator Humphrey's. Randolph's proposal required timber management to be adapted to a conservationist philosophy—*i.e., preservation* of the natural diversity of forest types and species. Randolph sought to prohibit any action in a national forest that would result in significant loss of fish or wildlife habitat. And Senators Lee Metcalf and Dale Bumpers offered an amendment to the NFMA, adopted, which drew heavily on Randolph's bill. (Metcalf and Bumpers were concerned in particular with the Service's practice of converting eastern hardwoods forests to "pine tree farms.") The Metcalf–Bumpers contribution to the NFMA strengthened the objectives of the Humphrey bill; their "diversity" and "overall multiple-use" terminology, for instance, aggressively promotes balanced resource management in national forests. *See* Wilkerson & Anderson, *Land and Resource Planning, supra,* at 293–295.

we should defer to its administrative construction of the provision. We have recognized that "the construction placed upon the [Voting Rights] Act by the Attorney General ... is entitled to considerable deference." [ ] But the principle has its limits. Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and *then* only if the administrative interpretation is reasonable. [ ] Because the first of these conditions is not satisfied in the cases before us we do not defer to the Attorney General's interpretation of the Act.

*Id.* at ——, 112 S.Ct. at 831 (quotation and citations omitted). *Cf. United States v. Alaska*, —— U.S. ——, ——, 112 S.Ct. 1606, 1611, 118 L.Ed.2d 222 (1992) (White, J.) ("on its face," Section 10 of the Rivers and Harbors Appropriation Act of 1899 (RHA) (30 Stat. 1151, 33 U.S.C. § 403), "appears to give the Secretary *unlimited discretion* to grant or deny a permit for construction of a structure such as the one at issue in this case. The Reports of the Senate and House Committees charged with making recommendations on the Act contain *no hint* of whether the drafters sought to vest in the Secretary *the apparently unbridled authority the plain language of the statute seems to suggest.* See H.R.Rep. No. 1826, 55th Cong., 3d Sess. (1899); S.Rep. No. 1686, 55th Cong., 3d Sess. (1899).") (emphasis added).

TCONR does stand a substantial likelihood of success in its attempt to demonstrate, through the window of this Court's waiver of the exhaustion requirement, that Defendants have not satisfied Section 1604(g)(3)(F)(v)'s unambiguous requirement of actual forest resource *protection.* Magistrate Judge Guthrie's Report and Recommendation contains telling information and analysis. For example, her Report and Recommendation states: "Ecosystems of old growth forests are not explicitly considered in the EAs as an element of diversity....". Report and Recommendation of the United States Magistrate Judge, p. 44. And "[d]isruption and diminution of inner forest species is explicitly acknowledged in the [harvesting activity "consideration"] chart showing that the pileated woodpecker and the fox squirrel decline under even-age." *Id.* at pp. 44–45 (citing Admin.Rec., Vol. III, Compartment 93, EA at 38). Magistrate Judge Guthrie in fact concludes that a reader of the relevant timber sale EAs is "made aware of the unfavorable impacts on species of the mature forest." *Id.* at p. 56. Still other agency-"forgottens" are substantially likely to amount to a lack of Section 1604(g)(3)(F)(v) protection. *See* Report and Recommendation of the United States Magistrate Judge, p. 44 ("There is not an inventory of the flora and fauna in each compartment."); *id.* at p. 41 ("in Compartment 93, *only one* of the eight stated needs in the proposal pertains to *habitat per se* (Adm.Rec. Vol. III, Comp. 93 EA at 3) *and the Decision Notice and FONSI does not adopt habitat as a need,* although creation of early successional habitats required by *some* species of plants and animals is *mentioned* as one of nine reasons for selection of the chosen Alternative. Adm.Rec. Vol. III, Comp. 93 DN and FONSI at 2.") (emphasis added here).[17] The failure to comply with the

---

17. Compare the following findings from *Sierra Club v. Lyng,* 694 F.Supp. 1260, 1266–1268 (E.D.Tex.1988):

4. Even-aged stands are more susceptible to southern pine beetle infestation.

5. The Forest Service contention that at rotation age there is little difference economically between clear-cutting and selection management is not persuasive to the Court. The Court is persuaded that selection management does have economic advantages resulting from the avoidance of the high cost of regenerating clear-cut areas and the costs associated with the care required by highly vulnerable young stands. Selection management provides a good return during the entire lifetime of the period in question. Taking into consideration the value of money coupled with the high initial expense of even-age management, economic factors mitigate in favor of selection management. In addition to excellent economic returns, a well managed selection forest provides excellent habitat for deer and other wildlife, for recreational users, and is pleasing to the eye of even city dwellers.

6. The sole reason for the Forest Service's adoption of even-age or clear-cutting as the management method of choice is the fact that it is preferred by the timber companies. The Forest Service is an agency that has experienced a high degree of the "revolving door" phenomenon between governmental and pri-

NFMA's substantive, forest resource protection requirement is clearly an act "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A) & (C).

2. The *NEPA Does Not Sanction Shallow, Circular, Conclusory, or Simply Unreasonable Agency "Considerations"*

The NFMA incorporates the NEPA's procedures. 16 U.S.C. § 1604(g)(1). The plaintiffs stand a substantial likelihood of success on their *NEPA claims* against Defendants' even-aged logging agenda, as well.

■ The NEPA requires that an agency charged with preparing an environmental impact statement take a "hard look" at the environmental consequences of the project, and that it disclose the risks, present the alternatives, and respond with reasoned analysis to the opinions of reputable scientists concerning the hazards. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (Powell, J.). *Accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–351, 109 S.Ct. 1835, 1845–1846, 104 L.Ed.2d 351 (1989) (Stevens, J.).

The plaintiffs have not yet been able to receive judicial review of the 1987 LRMP–FEIS to which the scheduled sales at issue are tiered. As Magistrate Judge Guthrie stated, this is troubling because "to the extent it has been judicially reviewed, the LRMP has been found severely wanting with respect to the Red–Cockaded Woodpecker, a species that was ostensibly protected and

provided for by the Plan." Report and Recommendation of the United States Magistrate Judge, p. 12 (citing *Sierra Club v. Lyng*, 694 F.Supp. 1260 (E.D.Tex.1988)). Still, Magistrate Judge Guthrie did review the EAs (and findings of no significant impact (FONSIs)) concerning the scheduled timber sales. And this Court has now waived the exhaustion of administrative remedies requirement relative to the plaintiffs' NFMA and NEPA claims against Defendants.

■ Under the NEPA, the Court has a duty to acknowledge the agency's presumed expertise in making its environmental impact findings and in deciding ultimate issues as to whether or not to proceed with a particular forest management operation. But the Court must nonetheless safeguard the congressionally-envisioned procedural process. The Court must insure that the Service, in conducting its NEPA-required evaluations, meaningfully assesses the foreseeable environmental effects of a proposed action.

For example, in *Citizens for Environmental Quality v. United States*, the Colorado district court recognized that the NEPA requires that the Forest Service give a meaningful consideration to alternatives which not only emphasize differing factors, but lead to differing results. 731 F.Supp. 970, 989 (D.Colo.1989) ("Considerations of alternatives which lead to similar results is not sufficient under NEPA and [36 C.F.R. § 219.12(f) ]"). Specifically, the court agreed with the citizen-plaintiffs and intervenors, that the Rio Grande Forest Plan failed to formulate a meaningfully "broad range" of alternatives in

vate interests. That is to say that the greatest market for government employees in private industry is with the large timber companies. This fact provides an incentive for agency personnel to accommodate industry desires—thus, that explains the high level of influence the timber companies have over policies and practices of the Forest Service.
And compare all of the above with: James O. Freedman, Crisis and Legitimacy. The Administrative Process and American Government (1978) (recognizing that congressional purposes can be undermined by insufficient regulation or agency hostility to statutory programs); Paul J. Quirk, Industry Influence in Federal Regulatory Agencies (1981) (general discussion of the agency "capture" phe-

nomenon). The Service's argument for the Court to allow the even-aged logging now scheduled must also be considered by the light of the observation of many that the Forest Service has a "habit" of maximizing timber production at the cost of other NFMA statutory factors. *See e.g., West Virginia Div. of Izaak Walton League of America, Inc. v. Butz*, 522 F.2d 945, 954–955 (4th Cir.1975); John S. Harbison, *Hard Times in the Softwoods: Contract Terms, Performance, and Relational Interests in National Forest Timber Sales*, 21 Envtl L. 863, 879 (1991); George C. Coggins and Michael E. Ward, *The Law of Wildlife Management on the Federal Public Lands*, 60 Or. L.Rev 59, 133 (1981). William Dietrich, The Final Forest (1992).

violation of Forest Service regulation 36 C.F.R. § 219.12(f). *Id.* at 989.[18] The Forest Planners ostensibly considered nine alternatives before arriving at the LRMP for the Rio Grande National Forest. But the court found from the record that it appeared the Forest Service had first established timber production goals, and then formulated its "alternatives" in a manner *guaranteeing that the Service Planners would reach those goals.* The court held that this result-driven (biased) decisionmaking process prevented the Service from establishing a *legitimately* broad range of reasonable alternatives as required by the relevant statutory and regulatory scheme. *Id.* at 989–990. In short, Chief Colorado District Court Judge Sherman Finesilver was not persuaded that the Service adequately considered *each* of the alternatives which were developed during the planning, or consideration process:

> From its evaluation, it is clear that the Forest Service gave a "hard look" only to those alternatives which increased timber production. Alternatives which reduced timber production were "readily dismissed." The Forest Service thus considered *only* alternatives which led to a similar result—increased timber production. This does not constitute a consideration of a broad range of alternatives as contemplated by § 219.12(f). While nothing prevents the Forest Service from adopting an alternative which increases timber production, this does not permit the Forest Service to seriously consider only those alternatives which provide for increased timber production, to the exclusion of alternatives which do not have the same end result.

*Id.* at 990 (emphasis added).

It seems likely that the defendants performed a similarly skewed "consideration" of alternatives in this case, as Plaintiffs contend. The Service here purports to have considered only *four* tree cutting options for the Compartments at issue (one of which was the essentially *non*-alternative (because of southern pine beetle infestation) of "no ac-

tion"). *See* Report and Recommendation of the United States Magistrate Judge, p. 26 ("Four different alternatives were considered in most of the EAs: number one was No Action; Number Two was selection (unevenage); three and four were various combinations of even-age."). And even the consideration of these four alternatives appears obviously and extremely cursory.

The Court is convinced that the plaintiffs stand a substantial likelihood of demonstrating that the defendants have "swept" some significant environmental considerations and criticisms of its scheduled even-aged management actions "under the rug," or failed to give good faith, meaningful consideration to foreseeable, statutorily important, environmental consequences of its planned even-aged logging activities. What has been addressed above with respect to the NFMA is important in regard to the NEPA as well: the defendants somehow choose *NFMA-exceptional* even-aged management techniques as a *rule.* Meanwhile, as the Report and Recommendation of the United States Magistrate Judge states: "Ecosystems of old growth forests are *not explicitly considered* in the EAs as an element of diversity; the EAs do not inform the public that there are types of ecosystems that exist only in old growth." Report and Recommendation of the United States Magistrate Judge, p. 44. And while "many" aspects of diversity were apparently considered, "[d]isruption and diminution of inner forest species is explicitly acknowledged in the [harvesting activity "consideration"] chart showing that the pileated woodpecker and the fox squirrel decline under even-age." *Id.* at pp. 44–45 (citing Admin.Rec., Vol. III, Compartment 93, EA at 38); *see also id.* at p. 45 (while acknowledging that "the FEIS to which the EAs are tiered contains a fuller discussion of diversity," also noting that it still does not reference old growth ecosystems *per se* ). Moreover, "[t]here is not an inventory of the flora and fauna in each compartment." Re-

---

18. The court construed 36 C.F.R. § 219.12(f): The interdisciplinary team shall formulate a broad range of reasonable alternatives according to NEPA procedures. The primary goal in formulating alternatives, besides complying with NEPA procedures, is to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits . . . .

port and Recommendation of the United States Magistrate Judge, p. 44. *See also id.* at p. 41 ("in Compartment 93, *only one* of the eight stated needs in the proposal pertains to *habitat per se* (Adm.Rec. Vol. III, Comp. 93 EA at 3) *and the Decision Notice and FONSI does not adopt habitat as a need,* although creation of early successional habitats required by *some* species of plants and animals is *mentioned* as one of nine reasons for selection of the chosen alternative. Adm.Rec. Vol. III, Comp. 93 DN and FONSI at 2.") (emphasis added here). *Compare Sabine River Authority v. Department of the Interior,* 951 F.2d 669, 676–677 (5th Cir.) (recognizing: (1) the purpose of the NEPA is to insure that federal agencies "carefully consider detailed information" concerning significant environmental impacts; and (2) the NEPA commands that the agency cannot proceed with an action until it has taken a "hard look" at foreseeable environmental consequences), *cert. denied,* —— U.S. ——, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992) (emphasis added). *Compare also Seattle Audubon Society v. Moseley,* 798 F.Supp. 1473, 1483 (W.D.Wash.1992) (agency must in fact consider the environmental effects of its actions on *all species*—*i.e.,* it must plan for the entire biological community) (citing *Seattle Audubon Society v. Evans,* 952 F.2d 297, 301 (9th Cir.1991)).

In sum: Defendants fail to appreciate that the NFMA's Section 1604(g)(3)(F)(v) places clear, substantive limits on their logging activities—no matter how "considered"—and this failure on the part of Defendants is itself "a clear error of judgment." *See March v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (Stevens, J.) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (Marshall, J.)). Certainly in light of this failure on the part of Defendants to recognize their actual managerial duties, the above-referenced, administrative record(ed) appearances of cursory and/or biased planning confirm that it is indeed substantially likely that Plaintiffs will prevail on their NEPA claims, as well as their NFMA claims against Defendants' even-aged logging agenda.

**B.** *Substantial Threat of Irreparable Harm Absent Injunction*

As noted above, environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration—*i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (White, J.). In that the immediately impending timber sales at issue appear substantially likely to violate the NFMA's substantive prescriptions about natural resource valuations, or priorities, the sales pose a quite substantial threat of irreparably injuring the NFMA-*protected* national forest resources, and thus, the frequent-forest-user plaintiffs. *See **Memorandum Opinion and Order*** of July 28, 1992, 1992 WL 501733 (deciding that Plaintiffs are regular visitors to the Texas National Forests and that Defendants' alleged illegal alteration of the esthetics and ecology of these forests would directly harm Plaintiffs).

**C.** *The Irreparable Harm Threatened is Greater Than That Caused by the Injunction*

Certainly, in light of the above considerations relative to natural resource values, the irreparable injuries threatened by the defendants' impending even-aged logging are greater than any harm potentially caused by the Court's issuance of a preliminary injunction against such logging activities. This is especially so given that such an injunction will not prevent Defendants from proceeding with their *thinning* and *selection management tree cutting.*

**D.** *The Public Interest Would be Served by the Injunction*

Bypassing the environmental laws will not fend off the changes transforming the timber industry. *See Seattle Audubon Society v. Evans,* 771 F.Supp. 1081, 1095–1096 (W.D.Wash.), *aff'd,* 952 F.2d 297 (9th Cir.

1991). And the public in fact has a significant stake in the judiciary insuring that executive agencies duly and faithfully execute the NFMA and the NEPA.

The federal courts have an obligation to insure that the agencies obey valid congressional prescriptions. When a federal court fails to prevent and correct statutory violations by excessively self-aggrandized, run-amok executive agencies, Congress' (and the people's) purposes are frustrated, and, more generally, the rule of law itself is subverted.[19] Judicial refusals to enjoin such violations abdicate, for one thing, the courts' affirmative role in the Constitution's system of checks and balances.

Specifically, the people have a substantial interest in this Court insuring that the national forests' resources are protected. As Judge William Dwyer recognized recently:

> The records of this and other reported cases show that management of the national forests in compliance with NFMA is vital because other measures are inadequate for many species. * * * The efforts of the Fish and Wildlife Service ("FWS") under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, come only after a species is threatened or endangered and fall short of systematic management of a biological community. See 57 Fed.Reg. 1796, 1804. In this sense the national forests offer a last chance.

*Seattle Audubon Society v. Moseley,* 798 F.Supp. 1484, 1490 (W.D.Wash.1992). Were the Court to abdicate to the agency defendants its Constitutional responsibility to hold them to their duty to enforce unambiguous environmental laws, the Court would effectively "repeal" the oft-times "last chance" environmental protection validly championed into the United States Code by the citizenry. Such a repeal would be especially certain given that (after having secured the Court's deference to it) the defendants have *shut down* their administrative apparatus. The Court simply will not enlist itself in such a would-be *contra*-Constitutional "silent coup."

## IV. Conclusion and Order

The "balance of harms" test results in a ruling favorable to Plaintiffs. The Court has weighed and considered the·public interest and the balance of equities between the parties. And the Court has concluded that Plaintiffs have shown a probability of environmental injury serious enough to outweigh any adverse affects from the issuance of an injunction.

Still, while further even-aged logging by Defendants must be preliminarily enjoined, there is no reason for the Court to enjoin the defendants' *thinning and selection cuts.* The essence of the Court's equity jurisdiction is to mold decrees to the necessities of each case. Flexibility, rather than rigidity, has distinguished such jurisdiction. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) (Douglas, J.).

### *Order*

For the foregoing reasons, the following is hereby **ORDERED, ADJUDGED AND DECREED:**

Plaintiffs' Urgent Motion for Injunction Under 5 U.S.C. § 705 is **GRANTED; a preliminary injunction against Defendants' *even-aged logging* hereby issues;**

There exist for judicial resolution genuine issues of material fact regarding (1) whether the even-aged logging activities of Defendants are, as unambiguously required by the NFMA's Section 1604(g)(3)(F)(v), "insured" (*i.e.,* certain) to be *consistent with the protection of* soil, watershed, fish, wildlife, recreation, and esthetics resources, and the regeneration of the timber resource; and (2) whether, under the NEPA, the defendants' even-aged logging agenda is the product of good faith, meaningful considerations of, or a "hard look" at foreseeable, statutorily important, environmental consequences. Accordingly, Defendants' Motion for Summary Judgment is **DENIED.**

---

**19.** As already noted, it was public umbrage over the use (or, abuse) of the virtually unbridled, pre-NFMA Forest Service resource-management discretion that *led* Congress—*through enactment of* *the NFMA*—to restrain Service operations. Wilkinson & Anderson, *Land and Resource Planning, supra,* at 290–291.

To the extent it is inconsistent with this *Memorandum Opinion and Order,* the Report and Recommendation of the Magistrate Judge is **REJECTED;** it is otherwise **ADOPTED.**

SO ORDERED.