Glen AYERS, Martin E. Walter and
Alexander Shea, Plaintiffs,

v.

Michael ESPY, in his official capacity as
Secretary of Agriculture, David Unger,
in his official capacity as Chief of the
United States Department of Agricul-
ture Forest Service, Elizabeth Estill, in
her official capacity as Regional Forest-
er, Defendants.

Civ. A. No. 93–B–1103.

United States District Court,
D. Colorado.

Nov. 16, 1994.

Order Denying Reconsideration
Dec. 21, 1994.

Paul Gordon, Don, Hiller & Galleher, P.C., Denver, CO, Roger Flynn, Boulder, CO, for plaintiffs.

Robert D. Clark, Asst. U.S. Atty., Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

This matter comes before me on the parties' cross-motions for summary judgment. Plaintiffs Glen Ayers, Martin E. Walter, and Alexander Shea (collectively plaintiffs) bring this action seeking declaratory and injunctive relief for alleged violations of the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* arising from the United States Department of Agriculture Forest Service's decision to sell timber in the Long Draw area (the 1992 decision or the Long Draw timber sale).

The defendants, all sued in their official capacities, include the Secretary of Agriculture Michael Espy, Chief of the Forest Service David Unger, and Regional Forester Elizabeth Estill (collectively, the Forest Service or the government). Jurisdiction is based on 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 1361 (mandamus). The motions are adequately briefed and orally argued. For all of the reasons set forth below, I will grant the government's summary judgment motion in part, deny it in part, and grant in part and deny in part plaintiffs' cross-motion. Accordingly, the 1992 decision will be remanded to the Forest Service to correct the legal deficiencies as indicated below.

## I.

The Long Draw area is located in the Arapaho and Roosevelt National Forests. Administrative Record (AR) Vol. IV, 245. The Long Draw timber sale was subject to public input during the "scoping" process which began in 1983. The Forest Service rendered its first decision (the 1988 decision) approving timber harvest in the Long Draw area in August, 1988. This decision proposed logging 3 million board feet of predominately lodgepole pine from approximately 150 acres within the Long Draw area. A board foot is the amount of wood contained in an unfinished board one inch thick, twelve inches long and twelve inches wide. The primary logging method to be used was clearcutting. Under the clearcutting system, all trees are cut in an area which is then artificially replanted or left to reseed naturally. *Sierra Club v. Cargill,* 732 F.Supp. 1095, 1097 (D.Colo.1990), *on subsequent appeal,* 11 F.3d 1545 (10th Cir.1994).

In September, 1988, the 1988 decision was rescinded to allow further analysis of environmental impacts. Shortly thereafter, plaintiff Ayers and others indicated concerns with the 1988 decision. The Forest Service issued a new decision (the 1990 decision) in August, 1990. The second decision reduced the amount of timber to be harvested by almost 1 million board feet, to 2.03 million board feet on approximately 150 acres. Plaintiffs administratively appealed the sec-

ond decision (1st Appeal) which resulted, on remand to the Forest Service, in the 1992 decision. The 1992 decision, published in June, 1992, is the subject of this lawsuit. While this decision reduced the timber to be harvested to 840 thousand board feet, it increased the acres affected from 150 to 240. The 1992 decision also changed the primary logging method from clearcut to shelterwood. Specifically, 25 acres are to be harvested by the clearcut method, and the remaining 215 acres, by shelterwood cuttings. Under the shelterwood system, mature trees are cut in stages, allowing the remaining mature trees to reseed the area and shelter the seedlings. *Cargill,* 732 F.Supp. at 1097. The treatment method specified for each proposed cutting unit is as follows: 1) three units, C, CC, and EE are clearcuts; 2) six units, A, B, F, G, L, and BB are shelterwood "removals"; and 3) units D, M, O, T, U, V, X, and DD are shelterwood preparatory cuts, shelterwood seed cuts, or group shelterwoods. 1992 Environmental Assessment Supplement (1992 Supp. EA)—AR Vol. IV, 316.

On August 3, 1992, the last day for appealing the 1992 decision, the plaintiffs, along with others, deposited in the United States mail an appeal of the Long Draw timber sale (the 2nd Appeal). *See* Original Complaint, "First Claim for Relief". Erroneously, the United States Post Office (the Post Office) postmarked the appeal August 4, 1992. As a result, it was dismissed as untimely. Ayers then presented evidence to the Forest Service that the Post Office incorrectly datestamped the appeal envelope. Subsequently, the government conceded the appeal was timely. Plaintiffs' response, exh. A. Notwithstanding this admission, the Forest Service has not considered the merits of the 2nd Appeal.

Plaintiffs now assert the following claims: 1) the government adopted a "Biologically Feasible" standard for evaluating whether the Long Draw area can be restocked within five years after harvest which standard violates NFMA, specifically, 16 U.S.C. § 1604(g)(3)(E), and its implementing regulations; 2) the government failed to provide factual support for its claim that it can meet NFMA's five-year restocking standard, vio-

lating NFMA, 16 U.S.C. § 1604(g)(3)(E), and its implementing regulations; 3) the government failed to consider any uneven-aged harvesting methods and failed to justify on a sale-specific basis the exclusive use of even-aged methods over uneven-aged in violation NFMA, 16 U.S.C. § 1604(g)(3)(F); and 4) the government failed to study and develop alternatives in violation of NEPA, 42 U.S.C. § 4332(2)(E) and its implementing regulation. Plaintiffs seek an order declaring that the government has violated NFMA and NEPA in approving and permitting the Long Draw timber sale. Plaintiffs also seek an immediate and permanent injunction prohibiting the government from taking any action furthering a commercial timber sale in the Long Draw area. Finally, plaintiffs seek costs and attorneys fees.

## II.

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Here, both parties move for summary judgment and neither party contends that there are material factual issues precluding a judgment as a matter of law. Furthermore, neither party responds to the other's summary judgment motion with specific facts demonstrating a genuine issue for trial. I agree there are no genuine disputes of material fact and summary judgment is now appropriate.

The issues requiring resolution are as follows:

1) Whether exhaustion principles preclude consideration of any issue or claim in this case:

2) Whether plaintiffs' challenge to the Long Draw timber sale as a violation of NFMA's five-year restocking requirement is barred by 28 U.S.C. § 2401(a), the six-year statute of limitations;

3) Whether the 1992 decision, which proposes shelterwood cutting of 215 acres, violates NFMA's five-year restocking requirement;

4) Whether the government used an illegal regeneration standard ("biological feasibility") to measure restocking;

5) Whether the government violated NEPA by failing to review and justify on a sale-specific basis the exclusive use of even-aged timber cutting over uneven-aged methods;

6) Whether the government violated NFMA by failing to review and justify on a sale-specific basis the exclusive use of even-aged timber cutting over uneven-aged methods;

7) Whether the government failed to analyze adequately environmental issues in approving the Long Draw timber sale.

## III.

The threshold question before me is whether any of plaintiffs' claims are barred for failure to exhaust administrative remedies or under the applicable statute of limitations, 28 U.S.C. § 2401(a).

### A.

▪ Generally, a litigant must exhaust available administrative remedies before seeking judicial review. *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 743 (10th Cir.1982). The exhaustion requirement is not jurisdictional, but involves the exercise of judicial discretion. *Massengale v. Oklahoma Bd. of Examiners in Optometry*, 30 F.3d 1325, 1328 (10th Cir.1994). In *McKart v. U.S.*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the Court articulated the rationales underlying the exhaustion doctrine. They are to: 1) deter deliberate flouting of administrative processes; 2) allow agencies to discover and correct their own errors; 3) eliminate unnecessary judicial review when the agency grants a complaining party's request; 4) avoid premature interruption of the administrative process; 5) acknowledge deference for agency expertise; 6) recognize executive and administrative autonomy; and 7) develop a factual record. *McKart*, 395 U.S. at 194–96, 89 S.Ct. at 1663–64. Notwithstanding these substantial interests, the Court has declined to require exhaustion in some circumstances even where

administrative and judicial interests would counsel otherwise. *McCarthy v. Madigan,* 503 U.S. 140, ——-——, 112 S.Ct. 1081, 1087–88, 117 L.Ed.2d 291 (1992). The exhaustion doctrine may not apply: 1) if pursuing an administrative remedy will impair an individual's ability to later seek judicial review—as when the likelihood of obtaining an administrative resolution within a reasonable time will result in prejudice to the individual; 2) when the administrative remedy is inadequate; or 3) when the administrative body is shown to be biased or has otherwise predetermined the issue. *Id.; see also Massengale,* 30 F.3d at 1328–29.

■ In its brief, the government urges me to dismiss each of plaintiffs' claims for failure to exhaust their administrative remedies. At oral argument, however, the government indicated it would not press its exhaustion doctrine argument. Indeed, I conclude that the unique circumstances in this case warrant waiver of the administrative exhaustion requirement. In *Sierra Club v. Espy,* 822 F.Supp. 356 (E.D.Tex.1993), *rev'd on other grounds,* 18 F.3d 1202 (5th Cir.1994), the chief of the United States Forest Service notified the plaintiffs that no decision on the merits of their administrative appeal would be forthcoming because the overriding Forest Plan was being remanded for revision. *Id.* at 359 n. 5. Because of the government's excessive delay thwarting the administrative appeal apparatus, the *Sierra Club* court waived the administrative exhaustion requirement. *Id.* at 360.

The Forest Service in this case has also disregarded the administrative appeal apparatus. Notwithstanding its admission that plaintiffs' 2nd Appeal was filed timely, the Forest Service has failed to take any action whatsoever on the 1992 Appeal. Equally noticeable is the government's failure to provide adequate justification for its inaction. Consequently, the Forest Service is responsible for undermining many of the rationale supporting the exhaustion doctrine under *McKart* and for truncating the administrative appeal process. In addition, there is no indication that the Forest Service will ever consider the merits of the 2nd Appeal. Therefore, if plaintiffs are required to wait

for the Forest Service to decide the appeal before seeking judicial review of the 1992 decision, plaintiffs may be denied this right altogether. The government's conduct compels waiver of the exhaustion requirement. Moreover, under general equitable powers and those granted under the APA, I must insure plaintiffs' statutory rights are not denied by agency action or inaction. *Sierra Club v. Espy,* 822 F.Supp. at 360–61.

■ Furthermore, plaintiffs' primary basis for requesting revision of the 1992 decision rests on issues of statutory interpretation which are not subject to the exhaustion of remedies doctrine. *See infra* IV.A and B; *Frontier Airlines, Inc. v. Civil Aeronautics Bd.,* 621 F.2d 369, 371 (10th Cir.1980) (citing *McKart,* 395 U.S. at 197–98, 89 S.Ct. at 1664–65) (The general rule requiring exhaustion of remedies is subject to an exception where the question is solely one of statutory interpretation). In addition, each of the issues in this case were raised at some point and in some fashion during the administrative process. Thus, the government's argument that certain issues were not raised in plaintiffs' administrative appeals is also without merit. These questions are within the scope of my review. *See Citizens for Environmental Quality (CEQ) v. U.S.,* 731 F.Supp. 970, 993 (D.Colo.1989) (raising issues in comment letters during the notice and comment period which the defendants responded to is a sufficient presentation of issues at the administrative level to place them within the review jurisdiction of the court).

### B.

■ Next, the government argues that 28 U.S.C. § 2401(a) precludes consideration of plaintiffs' challenge to an agency regulation adopted in 1979. Section 2401(a) provides in relevant part:

> ... every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

It is undisputed that a party seeking to challenge a procedural violation in the adoption of a regulation must bring the action within six years of the decision. *Wind River*

*Min. Corp. v. U.S.,* 946 F.2d 710, 715 (9th Cir.1991); *Sierra Club v. Penfold,* 857 F.2d 1307, 1316 (9th Cir.1988). In addition to procedural deficiencies, a party bringing a lawsuit against an agency for its alleged failure to implement rules and regulations required under federal law is subject to the six-year statute of limitations. *Federal Lands Legal Foundation v. U.S. Forest Service,* 13 F.3d 405, 1993 WL 503166, at *2 (10th Cir. Dec. 8, 1993).

 I disagree with the government's contention that plaintiffs are challenging the 1979 restocking regulation, 36 C.F.R. 219.27(c)(3). Instead, they are challenging the application of the regulation to the Long Draw timber sale. Therefore, *Federal Lands Legal Foundation* is inapposite. In holding plaintiff's claim time-barred in *Federal Lands,* the court noted that the plaintiff was not challenging application of the regulation to any of its members. *Federal Lands,* 1993 WL 503166, at *2.

 When, as here, a party challenges application of a regulation, the statute of limitations begins to run at the completion of the administrative proceedings, not when the rule is promulgated. *Functional Music, Inc. v. F.C.C.,* 274 F.2d 543, 546–47 (D.C.Cir. 1958), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959); *see Wind River,* 946 F.2d at 716 (quoting *Crown Coat Front Co. v. U.S.,* 386 U.S. 503, 511, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967)) (The right to bring a civil suit challenging an agency action accrues "upon the completion of the administrative proceedings"). Accordingly, I conclude that plaintiffs' action is timely. The November 15, 1993 amended complaint is easily within the six-year period.

### IV.

 I now turn to the substantive issues. The Administrative Procedure Act, 5 U.S.C. §§ 701–706 (the APA), applies and is the basis for judicial review of the Forest Service's decision. Under the APA, I must affirm a final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When applying subsection (A), I must consider whether the

decision is based "on a consideration of all relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

### A.

The first question is whether the 1992 decision, as it relates to the shelterwood cutting on 215 acres, violates NFMA's five-year restocking requirement. At the outset, I recognize that my framing of this issue differs somewhat from that of the parties. The government contends the issue is "whether the five-year restocking standard in NFMA applies to all units of the timber sale or only to the clear cut units". Government's motion, p. 2. In contrast, plaintiffs assert the issue is "whether the Forest Service's decision to exempt shelterwood (and seed-tree) harvests from NFMA's restocking requirement eviscerates that requirement". Plaintiffs' motion, p. 13. Subsequently, plaintiffs reply that they are not challenging the legality of the restocking regulations, but application of the regulations to the Long draw sale. Plaintiffs' Reply, p. 1–2. Consistent with plaintiffs' analysis in their reply, I reframed this issue.

 Notwithstanding the government's extensive briefing of this issue, it contends this question falls outside the claims asserted in plaintiffs' amended complaint and, thus, it should not be addressed here. I disagree. The complaint need only be written sufficiently to put the agency on notice of its wrongful conduct. Fed.R.Civ.P. 8(a)(2). Paragraph 31 of plaintiffs' amended complaint adequately raises this issue. It states: "The failure to assure that the Long Draw area can be adequately restocked within five years after harvest violates the NFMA and its implementing regulations, including in particular 16 U.S.C. § 1604(g)(3)(E)." Moreover, the government's extensive briefing of NFMA's regeneration requirement and its recognition of this issue in its amended answer at ¶¶ 26 and 31 cure any deficiency in the plaintiffs'

amended complaint. This issue is properly before me.

Congress passed NFMA in 1976 to manage the nation's forests and maintain renewable resources. *Sierra Club,* 732 F.Supp. at 1097. Under NFMA, the Secretary of the Agriculture must promulgate regulations which shall include, but not be limited to . .

3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

E) insure that timber will be harvested from National Forest System lands only where—

. . . . .

ii) there is assurance that such lands can be adequately restocked within five years after harvest . . .

16 U.S.C. § 1604(g)(3)(E)(ii). To implement § 1604(g)(3)(E)(ii)'s mandate, the Secretary adopted 36 C.F.R. § 219.27(c)(3) which reads in pertinent part:

c) The following management requirements apply to timber harvest and cultural treatments:

. . . . .

3) When trees are cut to achieve timber production objectives, the cuttings shall be made in such a way as to assure that the technology and knowledge exists to adequately restock the lands within five years after final harvest. . . . Five years after final harvest means 5 years after clearcutting, 5 years after final overstory removal in shelterwood cutting . . .

Plaintiffs argue that the congressional intent to require restocking within five years for *all* harvest methods is clear under NFMA. The government, relying on its regulation, contends that NFMA's five-year restocking requirement applies only to clearcut units. The primary harvest method in this case is shelterwood cutting. AR Vol. IV, 333. According to the government, these shelterwood cuts are excluded entirely from NFMA's five-year restocking requirement. Later, in its response, the government revises this argument by contending that NFMA's statutory clock does not begin to run until the "final harvest" in the shelterwood cuts.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) controls my analysis in reviewing an agency's construction of the statute it administers. Under *Chevron* and its progeny, I am confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. *State of Colorado ex rel. Colorado State Bank Bd. v. Resolution Trust Corp.,* 926 F.2d 931, 936 (10th Cir.1991) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. *Id.* If the statute is silent or ambiguous with respect to a specific issue, the court must determine whether the agency's ruling on that issue is based on a permissible construction of the statute. *Id.*

Here, both parties focus on whether Congress intended to exempt or apply the five-year restocking requirement to all harvesting methods. However, the question is not whether the five-year restocking requirement applies to all harvesting methods, but whether Congress has directly defined the term "harvest". I conclude that Congress has neither unambiguously defined "harvest" under NFMA, nor more specifically, under its five-year restocking requirement.

Under *Chevron,* I may not simply impose my own construction on the meaning of this ambiguous term as would be necessary in the absence of an administrative interpretation. *Id.* Rather, I determine whether the agency's answer is based on a permissible construction of the statute. *Id.* Just as it is clear that courts will often defer to agency interpretations, it is equally clear that courts must not abdicate their role by affirming agency judgments based on statutory interpretations which are contrary to congressional intent or a statute's plain

meaning. *Lamkin v. Bowen,* 721 F.Supp. 263, 267 (D.Colo.1989). Restricting my analysis to the facts in this case, I conclude that the agency's interpretation of NFMA's five-year restocking requirement is contrary to Congressional intent.

My conclusion stems primarily from the government's admission that for the shelterwood cuts:

> [s]uch additional, later harvest may or may not ever be authorized by the Forest Service. Implementation of the second or third steps of the shelterwood harvests will require new decisions.

Government's Amended Answer, ¶ 17. Consequently, the Forest Service can effectively defeat the five-year restocking provision altogether in this case by never making the "final" harvest cut. Hence, application of the five-year restocking regulation in this case is clearly contrary to Congress's express mandate that "timber will be harvested only where there is assurance that such lands can be adequately restocked within five years after harvest."

Accordingly, I declare that the 1992 decision is not in accordance with the NFMA's restocking requirement, § 1604(g)(3)(E)(ii), to the extent it proposes shelterwood timber harvesting on 215 acres in the Long Draw area. The 1992 decision will be remanded to the Forest Service to amend its decision. Specifically, a revised decision must ensure that, for all shelterwood cuttings, a final removal or harvest take place so as to begin the running of the five-year restocking requirement. My holding is limited to the declaration that the 1992 decision is illegal under NFMA's five-year restocking requirement and its implementing regulation.

### B.

■ Relying exclusively on *Sierra Club v. Cargill,* 732 F.Supp. 1095 (D.Colo.1990), plaintiffs next contend that the agency's adoption of a "biologically feasible" standard to measure restocking is illegal under NFMA. I disagree.

The Forest Service outlined the criteria to judge biological feasibility of harvesting and regenerating trees as follows:

1) the action does not alter the local environment to the extent that tree growth is precluded (an irreversible commitment of resources);

2) The action emulates natural processes; and

3) the action will result in the initiation of establishment of young vigorous, disease and insect resistant trees through natural seeding as opposed to planting seedlings.

1990 Environmental Assessment (1990 EA)— AR IV, 235. Section 1604(g)(3)(E)(ii)'s implementing regulation, 36 C.F.R. § 219.27(c)(3), provides in relevant part:

> When trees are cut to achieve timber production objectives, the cuttings shall be made in such a way as to assure that the technology and knowledge exists to adequately restock the lands within five years after final harvest. Research and experience shall be the basis for determining whether the harvest and regeneration practices planned can be expected to result in adequate restocking.

Plaintiffs' interpretation of *Cargill* is overly broad. *Cargill* did not address biological feasibility. It held only that a "technological feasibility" interpretation of the NFMA's restocking requirement renders the five-year standard meaningless. *Cargill,* 732 F.Supp. at 1101. The court reasoned that "[h]ypothically, the technology exists to restock an area the size of the entire Bighorn National Forest (or the entire State of Wyoming) within five years."

Unlike "technological feasibility", "biological feasibility" does not render NFMA's five-year restocking requirement meaningless. Indeed, natural regeneration is the preferred alternative. Accordingly, I conclude that the Forest Service's adoption of a "biologically feasible" standard to measure restocking is in accord with NFMA.

### C.

Next, plaintiffs contend that the Forest Service violated NEPA and its implementing regulations by failing to review and justify adequately on a sale-specific basis the exclusive use of even-aged timber cutting over

uneven-aged methods. "Even-aged management" is defined as:

> The application of a combination of actions that results in the creation of stands in which trees of essentially the same age grow together.... Clearcut, shelterwood, or seed-tree cutting [cuts where all or a large percentage of trees in an area are harvested at one time] methods produce even-aged stands.

36 C.F.R. § 219.3. "Uneven-aged management" is defined as:

> The application of a combination of actions needed to simultaneously maintain continuous high-forest cover, recurring regeneration of desirable species, and the orderly growth and development of trees through a range of ... age classes to provide a sustained yield of forest products.... Cutting methods that develop and maintain uneven-aged stands are single-tree selection and group selection.

*Id.*

Under NEPA, all federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources". 42 U.S.C. § 4332(2)(E). Its implementing regulation, 36 C.F.R. § 219.12(f), provides:

> The interdisciplinary team shall formulate a broad range of reasonable alternatives according to NEPA procedures. The primary goal in formulating alternatives, besides complying with NEPA procedures, is to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits ...

■ This regulatory provision requires the Forest Service to take a "hard look" at alternatives which not only emphasize differing factors, but lead to differing results. *CEQ*, 731 F.Supp. at 989. Considerations which merely lead to similar results are not sufficient under NEPA and this section. *Id.* In determining the range of alternatives required by NEPA, I am guided by the "rule of reason". *Cf. Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir.1980) (applying the "rule of

reason" standard to determine whether the agency's consideration of alternatives in its environmental impact statement was sufficient). Information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned is required to determine the requisite level of detail. *Cf. All Indian Pueblo Council v. U.S.*, 975 F.2d 1437, 1444 (10th Cir.1992) (plaintiffs challenged the adequacy of alternatives considered in an environmental impact statement prepared by the Bureau of Indian Affairs). However, NEPA does not require agencies to analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective". *Id.* (quoting *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984)).

■ In applying the rule of reason, I note at the outset that under NFMA, uneven-aged management has not been rejected as too remote, speculative, impractical or ineffective. Indeed, it is the preferred cutting method. Under 16 U.S.C. 1604(g)(3)(F) the Forest Service must:

> F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands *only* where—
>
> (i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan
>
> . . . . .
>
> v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and aesthetic resources, and the regeneration of the timber resource. (emphasis added)

The *Sierra Club v. Espy* court also recognized this preference:

> The NFMA thus contemplates that even-aged management techniques will be used only in exceptional circumstances. Yet, the defendants appear to utilize even-aged management logging as if it composed the

statutory "rule," rather than the exception. The Service in fact utilizes uneven-aged management techniques very rarely—i.e., as an exception to even-aged logging. *Sierra Club v. Espy*, 822 F.Supp. at 363–64.

■ Notwithstanding NFMA's bias for uneven-aged management, the Forest Service argues that it examined a reasonable range of alternatives to satisfy the Forest Plan (the Plan) objectives and statutory and regulatory requirements. The government asserts that once the range of alternatives (the uneven-age method) was limited at the Plan level, it is unreasonable to expect the Forest Service to reevaluate the same range of alternatives at the project level. This proposition is without merit because the Plan does not eliminate the uneven-age method from the range of acceptable alternatives. In fact, the Plan allows up to 20% of the forest cover in the Long Draw area to be harvested with selection cuttings (an uneven-age method) if the situation justifies its use. The Plan states that while clearcutting is an "appropriate practice" for lodgepole, both shelterwood (an even-age method) and selection cutting (an uneven-age method) are "appropriate, but not a standard practice" and "may be acceptable where justified." Forest Plan at III–54. In addition, even though the Plan requires 80% of the forest cover in the cutting units at issue to be harvested by shelterwood, the remaining 20% may be treated using other harvest methods. *Id.* at III–132. As even the Forest Service admits and the Forest Plan reveals, while selection cutting, an uneven-aged method, is not standard practice, it is appropriate, and may be acceptable where justified.

To further support its contention that the Plan limited the Forest Service's alternatives to even-aged management, the government offers its response to a comment that uneven-aged management should be the first choice in timber harvest. The Forest Service replied:

> ... For shade intolerant species such as lodgepole ... uneven-aged management is very difficult and expensive to operate and does not always meet objectives.
> Many objectives are better met through the even-aged management systems in-

cluding clearcut and shelterwood approaches. This can provide visual quality, wildlife habitat, water yield, and regeneration. For example, although uneven-age stands are necessary for wildlife diversity and migration corridors, increasing the percentage of the Forest under uneven-age management would not necessarily be beneficial for either wildlife or regeneration purposes. A large percentage of stands on the Forest are already in mature or overmature conditions. As discussed in the Wildlife section, Chapter III of the EIS, many wildlife indicator species require early successional stages. To improve habitat for these species, it is necessary to increase the proportion of stands in seedling, sapling, and pole size classes. Even-age management can be used to accomplish this objective.

Plan's Final Environmental Impact Study Forest Plan, VI, 93–94. At most, this response reveals that uneven-aged management of the lodgepole pines may not be optimal. Besides, the Plan ultimately included uneven-aged harvesting as an acceptable practice in certain instances notwithstanding the government's response to this comment.

While I have a duty to acknowledge the agency's presumed expertise in making its environmental impact findings and in deciding ultimate issues as to whether or not to proceed with a particular forest management operation, I must nonetheless safeguard the congressionally-envisioned process required under NEPA. *Sierra Club v. Espy*, 822 F.Supp. at 367. Additionally, the Forest Service's own regulation, 36 C.F.R. § 219.12(f), requires it to formulate a broad range of reasonable alternatives according to NEPA procedures. In this case, the Forest Service considered eight alternatives in the 1990 Environmental Assessment (1990 EA) and a modified alternative after remand and the 1992 Supplemental Environmental Assessment (1992 Supp. EA) to arrive at the 1992 decision. 1990 EA—AR Vol. IV, 213. Four of these alternatives were considered in detail and four were eliminated. 1990 EA—AR. Vol. IV, 231. Alternative D, one of the four alternatives considered in detail, proposed an uneven-aged management for

spruce fir stands, but none of the eight alternatives considered uneven-age harvesting for lodgepole pine, the predominant tree species to be harvested. The Forest Service considered only alternatives which merely led to a similar result—even-age harvesting of lodgepole pine. This process falls short of NEPA's procedural requirements.

The government had earlier moved for an order barring all discovery and confining my review to the administrative record created before the agency. But now, the government submits an unsolicited extra-record declaration of its silviculturist, Paul Langowski, to prove that it considered and rejected uneven-aged management. The affidavit states:

> Based upon my field examinations I did not find stand conditions that were suitable for the application of uneven-aged methods, nor did the stated management objectives (citation omitted) for the Long Draw area dictate the need for a variety of age classes in a relatively small area.

Declaration of Paul G. Langowski (Langowski Dec.), ¶ 27. Assuming arguendo the Forest Service did consider and reject uneven-aged alternatives as unacceptable for the Long Draw area, the Forest Service's failure to even mention this rejected alternative in the 1990 EA or 1992 Supp. EA is fatal.

Under NEPA, the Forest Service should have revealed its rejection of the uneven-aged methods along with its reasoning in at least one of its environmental assessments. In discussing the extent of disclosure in an environmental impact statement under NEPA, the *CEQ* court stated:

> The thrust of NEPA is that all pertinent environmental data be gathered in one place i.e. the [environmental impact] "statement", there constituting a discussion of all relative environmental impacts of a proposed course or alternative courses of action which reflects that the agency has given all pertinent environmental matter a "hard look" and has made a "good faith, objective, and reasonable presentation of the subject areas mandated by NEPA . . .".

*CEQ*, 731 F.Supp. at 994 (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 560 (10th Cir.1977)). The court's reasoning in *CEQ* is persuasive.

If the Forest Service considered and rejected alternatives including uneven-aged harvesting methods for lodgepole pine, this should have been disclosed to the public before the summary judgment stage of this action. Moreover, the government offers no legal precedent for allowing it to supplement the alternative courses of action considered and disclosed in the 1990 EA at this late date. Again, the process falls short of NEPA's procedural requirements.

While nothing prevents the Forest Service from adopting upon an articulated basis grounded upon relevant factors of record an alternative which utilizes solely even-aged harvesting methods, this does not authorize the Forest Service to consider and publicly disclose *only* even-age harvesting methods for lodgepole pine when the Plan recognizes that uneven-age harvesting is appropriate in some circumstances and NFMA prefers uneven-aged harvesting methods. I hold that uneven-aged harvesting must be considered and discussed in the same way as other alternatives. The Forest Service's consideration of eight alternatives, none of which utilize an uneven-aged cutting method for lodgepole pine, does not constitute the broad range of alternatives contemplated by § 219.12(f) or 42 U.S.C. § 4332. Rather, this agency's action is arbitrary, capricious and not in accordance with law. The government will be directed to review and discuss alternatives based upon an uneven-aged harvesting of lodgepole pine and set forth its reasons for their selection or rejection.

### D.

■ Plaintiffs next contend that the government violated NFMA's requirement that clearcutting be used only where it is the "optimum" method and shelterwood cutting only where it is determined to be "appropriate" to meet the objectives and requirements of the relevant land management plan. *See* 16 U.S.C. 1604(g)(3)(F). The government argues that no violation of NFMA has occurred because its certified silviculturist found clearcutting to be the "optimal" harvesting methods for units C, CC, and EE and shelterwood cutting "appropriate" for the remaining cuts. I acknowledge the Forest Service's presumed

expertise *in deciding this issue. Id.* at 367. The government's argument misses the mark because, yet again, it failed to give meaningful consideration to all feasible and reasonable alternatives. While the Forest Service may ultimately reach this same conclusion, it must comply with NEPA's procedural requirements in doing so. Consequently, in considering all reasonable alternatives on remand, this question must be revisited.

### E.

█ Plaintiffs also argue that the government failed to analyze adequately environmental issues in approving the Long Draw timber sale. Specifically, plaintiffs first challenge the Forest Service's factual basis for concluding that lodgepole pine will be restocked in five-years under NFMA. According to plaintiffs, the Forest Service failed to consider adequately soil productivity. I agree with but one exception.

The 1990 decision was remanded in part because the level of soil information was grossly inadequate in light of the selected alternative, C1, and the proposed mitigation measures, premised on site-specific soil data, were inadequate. AR Vol. IV, 302. To correct these deficiencies, the Forest Service was directed to conduct a soils inventory and analysis to provide site-specific information sufficient to evaluate properly each proposed alternative and describe adequately the mitigation measures. 1992 Supp. EA—AR Vol. IV, 333.

The 1992 Supp. EA states that a site-specific soil field review of the timber sale layout for the modified Alternative C1 was completed on September 23, 1991. *Id.* However, according to the 1992 Supp. EA, the Forest Service was required to conduct a soils inventory and analysis to provide site-specific information sufficient to evaluate properly *each of the proposed alternatives.* At oral argument, I asked the government to identify those portions of the administrative record which prove that it complied fully with the remand order. In response, the government offered the 1992 Supp. EA. This document is insufficient to show that it evaluated properly *all* of the proposed alternatives. Indeed, a June 1, 1992 letter from the Forest

Service's soil Scientist reads: "The following information [a synopsis of each map unit and their limitations] is based on preliminary soils information for the 1990 field work and draft report. There has been no final correlation of this data at this time". AR Vol. III, 189–36. Absent final site-specific soil data for each proposed alternative, the Forest Service's soil analysis, as held in the 1990 remand, remains inadequate. This begins a domino effect.

Because the site-specific soil information is inadequate, the proposed mitigation measures included in the 1992 EA, premised on inadequate soil data, are also flawed. The 1992 decision will, therefore, be remanded to the Forest Service to correct these deficiencies. Specifically, the Forest Service must conduct a soils inventory and analysis to provide site-specific information sufficient to properly evaluate each proposed alternative, and it must set forth the reasons for a particular alternative's selection or rejection taking into consideration the soil productivity information. The mitigation factors will similarly need to be revisited.

█ Next, Plaintiffs challenge the Forest Service's factual basis for concluding the designated shelterwood cuts will regenerate within the five-year NFMA requirement. Although Langowski, the Forest Service's silviculturist, addressed directly the regeneration capabilities of the proposed clearcuts, *see* Langowski Dec. ¶ 29, he spoke only indirectly in his affidavit to the shelterwood's regeneration ability:

In my duties as Timber and Fire staff I have visited recent and old harvest areas throughout the districts and observed their regeneration success. In addition, during the field examination in the Long Draw area I reviewed areas that had been harvested and found areas well stocked with lodgepole pine seedlings and saplings.

Langowski Dec., ¶ 28. In addition, the regeneration issue was considered during the administrative process. For example, in soil evaluations in 1984 and 1988, it was noted that the past clearcut areas had "excellent regeneration", AR Vol. III, 155, and had "good regen[eration]". AR Vol. III, 153.

During the soils investigation of the original proposed cutting, the soil scientist emphasized the "past history of the immediate area where larger cutting units have had excellent regeneration and no decrease in productivity." AR Vol. III, 179. Relying on a statement from a silviculturist's 1989 report, AR. Vol. III, 247, the Supervisor responded to Ayer's 1990 Appeal by stating in relevant part: "The remaining 125 acres is in the lodgepole pine which has shown excellent regeneration after past harvest." AR Vol. I, 339. Finally, the 1992 Supp. EA and 1990 EA state:

> [Twenty to thirty years old] [t]reatments in lodgepole pine were generally 5 to 20 acre clearcut units. Currently, these harvested areas are reforested with lodgepole pine which, in most cases, is growing vigorously in heavily stocked stands averaging 15–20 feet in height. In some locations there are too many young pine for optimum growth and vigor.

1992 Supp. EA—AR Vol. IV, 329; 1990 EA—AR Vol. IV, 190.

The scientific nature of this question would normally preclude me from substituting my judgment on scientific methodology for that of the Forest Service, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989). In this case, the Forest Service's expert premised his conclusion on inadequate soil data and mitigation measures. Absent adequate site-specific soil data for all proposed alternatives, I must conclude that the Forest Service's determination that regeneration will occur within five-years from final harvest in the proposed shelterwood areas, if considered at all, was arbitrary and capricious. The last domino thus falls. The 1992 decision will also be remanded on this ground.

■ Finally, plaintiffs argue that sufficient analysis of the cumulative effects of the previous soil disruptions is insufficient to conclude no significant impact on this resource. The 1990 decision was remanded in part because the cumulative effects were not documented adequately to support a finding of no significant impact. AR Vol. IV, 302. A "cumulative impact" is:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. 1508.7. The 1992 Supp. EA, unlike the 1990 EA, adequately addresses whether any past actions combined with the effects of the proposed action will have any significant impacts. 1992 EA—AR Vol. IV, 331–326. Thus, the Forest Service's 1992 decision of no significant impact, including cumulative impact, was not arbitrary nor capricious.

## V.

■ Plaintiffs seek an order enjoining the implementation of the Long Draw timber sale. In the absence of a statutory provision, injunctive relief is not a matter of right, and granting or refusing such relief rests in the sound discretion of the court. *Goldammer v. Fay*, 326 F.2d 268, 270 (10th Cir.1964). The basis for injunctive relief is irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982). The issuance of an injunction is governed by traditional principles of equity. *CEQ*, 731 F.Supp. at 996. I must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief. *Amoco Production Co. v. Village of Gambell, AK.*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). Environmental injury, by its nature, can seldom be remedied adequately by money damages and is often permanent, or at least of long duration, thus, irreparable. *Id.* at 545, 107 S.Ct. at 1404. If such injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Id.*

In this case, injunctive relief is appropriate and, thus, will be granted. Plaintiffs have no sufficient legal remedy and if the Forest Service is allowed to proceed with the proposed timber harvesting activities, the Long Draw area will be harmed permanently or at least for a considerable time.

## VI.

Plaintiffs request an award of costs and attorney's fees. Because the action involved the United States, I consider the request under the relevant portion of the Equal Access to Justice Act:

(a)(1) ... a judgment for costs, ... but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity ...

. . . . .

(d)(1)(A) ... a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action ..., unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(a) and (d)(1)(A).

A private party falling within the statute is entitled to an award unless the government meets its burden of proving substantial justification or injustice in the circumstances. *CEQ*, 731 F.Supp. at 996 (citing *Kemp v. Bowen*, 822 F.2d 966, 967 (10th Cir.1987)). The determination whether the Government has met that burden lies in the sound discretion of the trial court. *Id.* The substantial reasonableness test is one of reasonableness both in law and in fact underlying the Government's position in the civil action and in the agency action out of which the litigation arises. *Id.* (citing *Kemp*, 822 F.2d at 967).

The government's position here was reasonable in light of the lack of established precedent and the evolutionary arena of natural resources/environment law. In addition, the government has prevailed in part and did not take a position which conflicted with settled precedent. Under these circumstances, the government's position was substantially justified. The request for costs and fees will be denied.

ACCORDINGLY, it is ORDERED, ADJUDGED, DECREED, and DECLARED that:

1) The 1992 decision is not in accordance with NFMA's restocking requirement, § 1604(g)(3)(E)(ii), to the extent it proposes shelterwood timber harvesting on 215 acres in the Long Draw area. The 1992 decision is also in violation of NEPA. The 1992 decision is SET ASIDE and is remanded to the Forest Service for reconsideration. Specifically, a revised decision must:

a) ensure that, for all shelterwood cuttings, a final removal or harvest take place so as to begin the running of the five-year restocking requirement;

b) consider alternatives based upon an uneven-aged harvesting of lodgepole pine and set forth the reasons for their selection or rejection;

c) revisit whether the chosen harvesting method is "optimal" where cutting is to be used and "appropriate" where other even-aged methods are selected;

d) conduct a soils inventory and analysis to provide site-specific information sufficient to evaluate properly each proposed alternative, and set forth the reasons for a particular alternative's selection or rejection;

e) reconsider mitigation factors in light of the more comprehensive soil productivity data; and

f) reevaluate its determination that any designated shelterwood areas will regenerate within five-years from the final harvest.

IT IS FURTHER ORDERED, ADJUDGED, DECREED, and DECLARED that the Forest Service's adoption of a "biologically feasible" standard to measure restocking is permissible under NFMA.

IT IS FURTHER ORDERED that:

1) Plaintiffs' motion for summary judgment is DENIED in part and GRANTED in part;

2) The government's motion for summary judgment is GRANTED in part and DENIED in part;

3) Judgment shall enter in favor of the government and against the plaintiffs on plaintiffs' first claim for relief;

4) Judgment shall enter in favor of the plaintiffs and against the government on plaintiffs' second, third and fourth claims for relief;

5) Each party shall bear its own costs and attorneys' fees;

6) The government is enjoined from implementing the Long Draw Timber sale until compliance with this order and opinion is demonstrated. I retain jurisdiction of this case only insofar as necessary to enforce compliance with this order.

## JUDGMENT

PURSUANT TO and in accordance with the Memorandum Opinion and Order filed November 16, 1994, by the Honorable Lewis T. Babcock, United States District Judge, it is

ORDERED that judgment is entered in favor of the defendants, Michael Espy, in his official capacity as Secretary of Agriculture, David Unger, in his official capacity as chief of the United States Department of Agriculture Forest Service, and Elizabeth Estill, in her official capacity as Regional Forester, and against the plaintiffs, Glen Ayers, Martin E. Walter and Alexander Shea, on plaintiffs' first claim for relief, and the first claim for relief is dismissed with prejudice. It is

FURTHER ORDERED that judgment is entered in favor of the plaintiffs and against the government on plaintiffs' second, third and fourth claims for relief. It is

FURTHER ORDERED that each party shall bear its own costs and attorneys' fees. It is

FURTHER ORDERED that the government is enjoined from implementing the Long Draw Timber sale until compliance with the Memorandum Opinion and Order filed November 16, 1994, is demonstrated. The Court retains jurisdiction of this case only insofar as necessary to enforce compliance with the Order.

## ORDER ON MOTION FOR RECONSIDERATION

Defendants Michael Espy, David Unger, and Elizabeth Estill (collectively, the government) move for partial reconsideration of my memorandum opinion and order, *Ayers v. Espy,* 873 F.Supp. 455 (D.Colo.1994) (the order). The motion is briefed fully and oral argument is unnecessary. The motion will be denied.

 There are three major grounds that justify reconsideration: 1) an intervening change in the controlling law; 2) availability of new evidence; and 3) the need to correct clear error or prevent manifest injustice. *Shields v. Shetler,* 120 F.R.D. 123, 126 (D.Colo.1988). In part, the government argues that partial reconsideration is warranted here because my order is inconsistent. I disagree. Accordingly, I will not grant its motion on this basis.

### A.

The government also moves for reconsideration of my order in light of a Fifth Circuit opinion, *Sierra Club v. Espy,* 38 F.3d 792 (5th Cir.1994), which was entered one day before my order. *Sierra Club* does not present intervening controlling law, but it does reverse a lower court opinion which I cited in my order. Therefore, I will address briefly the government's arguments based upon the *Sierra Club* decision.

The government contends that my conclusion that the Forest Service violated the National Environmental Policy Act (NEPA) by not considering the alternative of uneven-aged logging is erroneous. In this case, I defined the Forest Service's requirements under NEPA, in part, as follows:

... [W]hile nothing prevents the Forest Service from adopting upon an articulated basis grounded upon relevant factors of record an alternative which utilizes solely even-aged harvesting methods, this does not authorize the Forest Service to consider and publicly disclose *only* even-aged harvesting methods for lodgepole pine when the Plan recognizes that uneven-age harvesting is appropriate in some circumstances ...

*Ayers,* 873 F.Supp. at 468 (emphasis in original). The legal soundness of my conclusion is not diminished by the Fifth Circuit's decision.

In *Sierra Club,* the court rejects the notion that the National Forest Management Act (NFMA) establishes a "preference" for uneven-aged management. Instead, the court holds that the relevant NFMA provision reflects a "congressional wariness towards even-aged management, constraining resort to its use." *Sierra Club,* 38 F.3d at 800. Regardless of whether there is a "preference" for uneven-aged logging, *Ayers,* 873 F.Supp. at 466, 468, or a "congressional wariness towards even-aged management constraining resort to its use", the Forest Service was obliged to consider an uneven-aged harvesting method to comply with NEPA in this case.

Similarly, relying on *Sierra Club,* the government contends that the range of alternatives in an environmental assessment (EA) should not be held to the same standard as an environmental impact statement (EIS) and, thus, my conclusion should be reconsidered. Again, I disagree. In part, the government rests its argument on my discussion of *Citizens for Environmental Quality v. U.S.,* 731 F.Supp. 970 (D.Colo.1989) (CEQ). At the outset, I note that in asserting its argument, the government fails to recognize that in my discussion of *CEQ,* I explicitly recognized that *CEQ* concerned an EIS, not an EA. *Ayers,* 873 F.Supp. at 468. Furthermore, even if some distinction exists between EAs and EISs, reconsideration of my conclusion on this basis is unwarranted.

■■■ Section 102(2)(E) of NEPA requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in *any* proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (emphasis added). This provision is independent of the standard triggering preparation of an EIS and is not limited to proposed major actions significantly affecting the quality of the human environment. *River Road Alliance, Inc. v. Corps of Engineers of United States Army,* 764 F.2d 445, 452 (7th Cir.1985), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). Furthermore, nonsignificant impact does not equal no impact. *Id.* Thus, if an even less harmful alternative is feasible, it ought to be considered. *Id.* . Nevertheless, the smaller the impact, the less extensive a search for alternatives is to be expected of the agency. *Id.* While a federal agency need not consider all possible alternatives for a given action in preparing an EA, it must consider a range of alternatives that covers the full spectrum of possibilities. *Sierra Club v. Watkins,* 808 F.Supp. 852, 872 (D.D.C.1991). The discussion of alternatives in an EA need not be exhaustive, but it must "be sufficient to demonstrate reasoned decisionmaking." *Id.*

■■■ As stated in my order and confirmed by the Forest Service, selection cutting, an uneven-aged method, is appropriate, although not standard practice, and may be acceptable where justified. *Ayers,* 873 F.Supp. at 467. Under these circumstances, uneven-aged management is within the spectrum of possibilities for managing the lodgepole pine in the Long Draw area. Consequently, consideration of this alternative is necessary to ensure that the Forest Service reaches a reasoned decision. As it stands now, the EA fails to explain why an uneven-aged management alternative was not considered, much less selected as the harvesting method. Since the task of an EA is, in part, to briefly examine and dispense with alternatives, *Watkins,* 808 F.Supp. at 873, the Forest Service should have examined an alternative employing uneven-aged management and, if rejected, explained in the EA why this alternative was not appropriate.

#### B.

The government also requests clarification of my order to the extent that it is required to conduct a site-specific soil analysis for each of the proposed alternatives. This requirement, as I previously held, is necessary to properly evaluate each proposed alternative. The parties dispute as to whether this requirement imposes a substantive standard or whether it is intended merely to require

the Forest Service to comply with the 1990 remand.

It is well settled that NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uniformed—rather than unwise agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 333, 109 S.Ct. 1835, 1837, 104 L.Ed.2d 351 (1989). In this case, the government's failure to comply with the 1990 remand resulted in an uninformed decision. It also tainted the government's conclusion that the designated shelterwood cuts would regenerate within the five-year requirement under NFMA. Therefore, even though my order is not intended to create a new substantive standard, it does require the government to revisit the regeneration question to ensure its compliance with NFMA. It further ensures the government's compliance with NEPA.

Accordingly, IT IS ORDERED that:

1) The government's motion for reconsideration IS DENIED.